THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARREN LILES, Defendant-Appellant.

First District (6th Division)   No. 1—90—0923

Opinion filed July 17, 1992.

Randolph N. Stone, Public Defender, of Chicago (Lester Finkle, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Randall Roberts, and Brian Clauss, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The defendant, Darren Liles, and his sisters, Tara Liles and Latanya Liles, were indicted for first-degree murder and were represented by attorneys Leonard Karlin (Karlin) and Rachel Karlin in a bench trial before Judge Joseph J. Urso. Tara and Latanya were both acquitted, but the defendant was convicted.

The defendant was granted a new trial based on the newly discovered testimony of Chinyere Liles and Kirby Allen, indicating that they, rather than the defendant, may have killed the victim. The defendant's motion for substitution of judges was granted, and the case was assigned to Judge Christy S. Berkos for the second trial. The defendant was again represented by Leonard Karlin and Rachel Karlin and was again convicted, this time by a jury. He was sentenced to 20 years' imprisonment. The defendant's sole claim is that he was denied effective assistance of counsel.

Phyllis Harper testified that she had lived with Julian "Randy" Douglas at 1410 West 14th Street in Chicago. On March 25, 1989, Douglas left the apartment between 3:30 and 4 p.m. to go to the store. Around 4:45 p.m., a little boy who lived in the same building knocked on her door and told her that Douglas was fighting across the street. She went to the courtyard across the street and saw that Douglas had already been put into an ambulance. She saw his body that evening at Cook County Hospital.

Terrence Fulton testified that he lived in one of the rowhouses overlooking the courtyard where Douglas was killed. On March 25, 1989, at 4:30 p.m., he was awakened by some people arguing outside. He stuck his head out of his bedroom window and saw Douglas about 15 feet outside the window, walking east. He saw the defendant and his sisters, Tara and Latanya, walking about 20 or 25 feet behind Douglas. The defendant was carrying a baseball bat.

The defendant was standing facing Douglas, and Tara and Latanya were standing behind Douglas. The defendant swung the bat and hit Douglas, who fell to the ground. One of the girls kicked Douglas, and then the other girl kicked him twice. Fulton went downstairs and looked out his front door; the only people he saw were the defendant, the two girls and Douglas. He then went back inside and called the ambulance. When he went outside again, he saw two police officers talking to Tara and Latanya; the defendant was sitting on a stump nearby. The defendant got up and began walking west; when he passed Fulton, Fulton saw his face. Douglas was placed in an ambulance and taken away. Fulton walked back to his house and stood outside his front door. The police officers and the two girls who had been with the defendant went to a car and retrieved a bat from the trunk. Although Fulton was about 30 feet away when this happened, he thought the bat looked like the same bat he had seen the defendant carrying earlier. Later that evening, Fulton went to the police station at 3151 West Harrison and identified the bat. He also viewed a lineup and identified the defendant. He testified that before the date of the incident, he did not know the defendant. He had seen Douglas around the neighborhood but had never spoken with him.

On cross-examination, Fulton admitted that he did not tell the police at the scene that the defendant, who was sitting on a stump nearby, was the person who had hit Douglas; he did not identify the defendant until he got to the police station. Fulton also admitted that in his grand jury testimony, when he was asked, "Who did you see hit whom with the bat?" he replied, "I don't know his name." It was established that he had previously testified that the window out of which he said he had leaned to view the incident had a screen in it at the time. Fulton also testified that the bat struck Douglas on the left side of his face. (A pathologist later established that the injury that caused the death of Douglas was on the right side.)

Ezille Ross testified that he was visiting his sister at 1410 West 14th Street on March 25, 1989. As he was leaving her house around 4:45 that afternoon, he saw a crowd of people traveling east through the courtyard. He went to the west end of the courtyard and saw Douglas lying on the ground. As he was walking eastbound toward the crowd, he passed the defendant, who was quickly walking westbound. He recognized the defendant from the neighborhood. As he was passing the defendant, he also noticed Terrence Fulton standing in front of his doorway.

Ross saw the police officers go to a car with the defendant's sisters, and he saw one of the sisters open the trunk of the car and re-

trieve a bat. That evening Ross went to the police station where he viewed a lineup and identified the defendant.

On cross-examination, Ross testified that he got into an argument with a police officer at the station after he viewed the lineup, and he tried to hit the officer. The officer twisted his arm and bent his fingers back, and then handcuffed him to the wall. He then apologized to the officer, and the officer released him from the handcuffs. He testified that this altercation with the officer did not affect his identification of the defendant; he told the police the same story before this altercation as he did afterward.

Officer Eusebio Razo testified that he was patrolling in a squad car with his partner, Officer Phillips, on March 25, 1989. Around 4:37 p.m., they received a dispatch assignment to go to a disturbance at 1410 West 14th Street. As they were driving down Loomis Street on the way to the scene, they were flagged down by Latanya Liles near 1340 South Loomis. They proceeded about one-half block east, where they saw a large crowd gathered around a man lying in a pool of blood. They noticed that the man had suffered a blow to the head. Razo later learned the man's name was Julian Douglas.

After the ambulance took Douglas to Cook County Hospital, Officer Razo received several calls on his radio; citizens had called the dispatcher and given information about a bat in the trunk of a car. Razo asked witnesses for information about the bat. He spoke with Latanya Liles, Tara Liles, Thatisha Blandin, and Ezille Ross. The owner of a 1976 Chevrolet parked on Loomis came and opened the trunk of the car; the officers did not find a bat in that car. Razo received another radio transmission, informing him that the 1976 Chevrolet was the wrong car. He asked Tara Liles about a beige 1976 Buick parked on the north side of 1410 West 14th; she had the keys and she opened the trunk for the officers. The officers found a baseball bat in the trunk; Razo identified the Worth brand bat in court as being the same bat he recovered from the trunk of the beige Buick.

Detective Smulevitz and Detective Dorich arrived on the scene; Razo told them about the bat and pointed out the beige Buick to them. The officers drove Ezille Ross to Area 4 headquarters for investigation, and they inventoried the baseball bat. Later that evening, pursuant to instructions received from Detectives Smulevitz and Dorich, Razo and Phillips returned to 1410 West 14th, apartment 903, and drove the defendant to Area 4 headquarters. On cross-examination, Razo admitted that although there were 40 to 60 people in the crowd, he got only the name of one witness, Ezille Ross. Razo said

that no one else wanted to cooperate. Razo was also unable to name any of the citizens who had given information about the baseball bat.

Dr. Robert Kirschner, a forensic pathologist with the office of the Cook County medical examiner, testified that he performed an autopsy on Julian Douglas. Douglas had several superficial injuries on the left side of the face, including small lacerations and abrasions. These injuries would be consistent with someone falling to the ground and striking the pavement. The significant injury was to the right side of the neck. Although there was no evidence of any breaking of the skin or abrasions on the right side of the neck, it was, on external appearance, swollen and slightly bruised. The external swelling of the neck extended to the underside of the right side of the jaw, and the neck tissues were slightly black and blue.

He performed an internal examination of the right side of the neck and found that there was extensive bleeding in the subcutaneous tissues and the muscles of the right side of the neck, and he also found a fracture of the first cervical vertebra, the upper component of the spine. There was bilateral hemorrhage within the head, directly over the surface of the brain.

He testified that the injury was caused by a severe blunt force to the right side of the neck, and it must have been an extensive force in order to cause this type of injury, which was unusual and could only occur from a direct blow to the neck with extensive force. The injury would be very consistent with a blow from a baseball bat, but it would not be consistent with someone punching the victim with a fist or hitting him on the top of the head with a brick. He said that because a brick is a rough object, it would leave abrasions; he also said that it would be very difficult to produce enough force to fracture the cervical spine using a brick.

On cross-examination, he said that the injury could have been caused by some smooth, hard object other than a baseball bat. If the attacker was facing the victim and swung a bat from a normal right-handed batter's position, the bat would hit the victim on the left side of the neck, not the right side.

Detective Gerald Dorich testified that he conducted a lineup around 8:50 p.m. and Ross and Fulton viewed the lineup and identified the defendant. Ross and Fulton were placed in separate rooms and were not allowed to speak to each other before the lineup.

The defendant's first witness was Latanya Liles. She testified that on March 25, 1989, her cousin, Alonzo Bell, was visiting her home at 1410 West 14th Street, apartment 903. She lived there with

her two children and her brother, Leander Liles. Thatisha Blandin also came to her apartment sometime that day.

Around noon, she went to her sister Tara's house at 1433 West 13th Street, and the two of them went shopping together. When they returned to Latanya's apartment around 2:30 or 3 p.m., Bell called out the window to them, telling them to come upstairs because someone had broken into the house. When Latanya got upstairs, she discovered that someone had bent the security bars and had stolen her microwave and radio.

Latanya thought that Bell knew who had taken her microwave and radio. She went to the apartment next door and knocked on the door, but the people in that apartment ignored her. She returned to her apartment and retrieved a baseball bat, and then began beating on the neighbors' door with the bat. She heard her daughters outside calling her, so she dropped the bat by the door and went back to her apartment and looked out the window.

Latanya saw her daughter, Chaya Liles, standing downstairs with Thatisha Blandin; Thatisha told Latanya to come downstairs. About 10 minutes later, Latanya heard a crowd of people yelling up at her window. She looked out the window and saw the crowd pointing at Julian Douglas. Douglas began running, and the crowd ran after him.

Latanya left the apartment and went out to the courtyard, where she saw Julian Douglas lying on the ground. Her sister Tara caught up with her in the courtyard. When she first walked up to the victim with the bat in her hand, she saw Kirby Allen coming out of the courtyard, walking westbound toward her. Latanya came within 3½ or 4 feet of Douglas. She stayed at the scene for about five minutes and then ran to the phone and called the police. She told the police that the man who had broken into her apartment was lying on the ground and appeared to be injured.

Latanya gave Chaya a tool bag and the bat and told her to take them upstairs; she never saw the bat again. Chaya had recovered the tool bag from Kirby Allen's car. The bat was a new Louisville Slugger; it was a different bat than the one presented in court. She did not see the defendant while she had the bat. She was not present when a bat was removed from the trunk of a Buick; Kirby Allen's car was an Oldsmobile Delta 88, not a Buick.

After she flagged down the police, the two officers walked over to the victim with Latanya and Tara. Latanya and Tara talked with Officer Razo's partner; the defendant was standing there, and Latanya told him to take her daughters upstairs.

Around 5 or 5:30 p.m., two officers took Latanya and Tara to the police station at Harrison and Kedzie. Ezille Ross was in the room across the hall from her at the station. She saw Detective Smulevitz twist Ross' arm and bend his fingers back; then they slammed the door and locked it.

During the State's cross-examination of Latanya, the prosecutor asked her a question and Karlin interjected, "If you remember." Karlin was chastised by the judge in front of the jury; a few minutes later, out of the presence of the jury, the judge held Karlin in contempt and fined him $150.[1] Karlin moved for a mistrial, and the judge denied his motion. Latanya admitted on cross-examination that she had called 911 and said, "Send the police to 1410 West 14th Street, apartment 903, officer; somebody broke into my apartment, those dope fiends knows what's going on. Police better hurry 'cause I'm gonna kill somebody."

Alonzo Bell, the defendant's cousin, testified that he was visiting Latanya's apartment on March 25, 1989. Latanya left the apartment around 10 or 11 a.m. to go shopping with Tara; they returned around 2 or 2:30 p.m. Around 12:30 or 1 p.m., while Bell was at the neighbor's apartment next door, the neighbor heard some noise. Bell came out of the apartment and saw that the gate had been bent. He searched the apartment and then called 911 and asked for the police to come to 1410 South Loomis. The police did not come, so he called again.

There was a crowd of people downstairs; they called to Bell and said that the man who had broken into the apartment was downstairs. Bell and Latanya ran downstairs; Bell followed the crowd across the street toward the townhouses. When Latanya got downstairs, he told her to call the police and tell them that they had the man who had stolen her belongings.

Douglas was standing up when Bell first saw him from about 30 or 40 feet away. He did not see anyone with a baseball bat near Douglas. Bell did not see the defendant until after the police had arrived. Bell testified that he saw Kirby Allen hit Douglas with his fist on the right side of the face. When the police arrived, they found a brick ly-

---

[1] He was held in contempt a second time during closing arguments. In an unpublished Rule 23 order we reversed both contempt orders. We found that the first finding of contempt was not supported by the record. We found that the remarks of Karlin during closing argument were contemptuous but that there was a variance between the written order and the reasons given by the judge at the time he held Karlin in contempt.

ing by Douglas' head. The brick was a broken piece of cement pavement with jagged edges; the police officers picked up the brick and threw it in the grass.

Bell was first taken to the Racine police station, and then he was taken to the Harrison police station. He saw Ezille Ross in one of the detective rooms; Ross was on the floor, saying, "Don't hit me anymore." An officer took Bell back to Latanya's apartment around midnight.

On cross-examination, Bell admitted that he had identified the bat at the police station as the same bat that Latanya had earlier that day. However, he said that the bat presented in court was not the same bat he had seen at the police station; the bat that the detectives showed him was a "Louisiana Slugger." He never saw Latanya near the victim; she was about 25 feet from Douglas, talking to a police officer. He never told the detectives that Kirby Allen had hit Douglas.

Tara Liles testified that Latanya called the police. About one-half hour or one hour later, after the police had left, some children outside called up to them, telling them that the man that had broken into the apartment was outside. Latanya yelled out the window, asking where her "stuff" was. Tara and Latanya went downstairs and the man started running toward the rowhouses; the crowd was following him. When they reached the man, he was lying on the ground. Tara did not see anyone strike him. The defendant was not there.

Tara and Latanya went to the phone; Latanya did not have the bat. While they were at the phone, she saw the defendant walking south on Loomis. Tara did not see Latanya give the bat to anyone or put the bat in a car; however, she later went with the police to Kirby Allen's car and opened the trunk for the police; she saw them remove a bat from the trunk. She did not think that the bat the police took out of the car was the same bat that Latanya had been carrying earlier, and she did not think that the bat presented in court was the same bat the police had removed from the trunk of Kirby Allen's car. The bat that was in Kirby Allen's trunk was a new Louisville Slugger.

On cross-examination, Tara said that she was dating Kirby Allen at the time of the incident. Kirby Allen's car was a rust-colored 1978 Oldsmobile Delta 88, not a Buick.

Chinyere Liles, Latanya's daughter, testified that on March 25, 1989, she had been out with her mother, her sister, her aunt and her cousin. They arrived home around 3 or 4 p.m. and saw that the bars on their apartment had been bent. Alonzo Bell told them that their apartment had been broken into. Thatisha Blandin came over and de-

scribed the man that she had seen downstairs with their microwave and radio.

They looked out the window and saw the man. Chinyere, Kirby Allen, Chaya Liles, and Thatisha Blandin all ran downstairs and told the man that they wanted to talk to him. The man began running through the rowhouses, and they followed him, asking what he had done with their belongings. The man said that he did not know what they were talking about. The man swung at Chinyere, and Kirby Allen struck him in the side. The man fell to the ground; Chinyere dropped a small red brick on the man's head.

Latanya, Tara and the defendant were not there when Chinyere dropped the brick on the man's head. While the man was lying on the ground, Tara and Latanya arrived with a crowd of people. Latanya was carrying the bat; she told the man not to move, and she said that she was going to get some help. Latanya told Chaya to put the bat upstairs, and Chaya took the bat and put it in the back of Kirby Allen's car. The bat was a new Louisville Slugger.

On cross-examination, the prosecutor showed that at the first trial, Chinyere had testified that the defendant was present when they were chasing Douglas, and that the defendant was asking Douglas what he had done with their belongings. The prosecutor also showed that she had testified that the defendant was present when Douglas fell to the ground.

Thatisha Blandin testified that on March 25, 1989, she was with Chaya and Chinyere outside Latanya's apartment, and they yelled up to the window because they saw the man who had broken into Latanya's apartment. Latanya and Tara came downstairs, and they all followed the man. Thatisha did not see who hit the man; she turned her head to see whether Tara and Latanya were coming, and when she turned around, the man was on the ground. Chinyere then dropped a brick on the man's head. Kirby Allen was there before Latanya and Tara arrived. Latanya said that she was going to call for help. When they walked closer to the man, he took one last breath and then died. Thatisha said that she did not see the defendant until after the police had arrived.

The defendant's last witness was Chaya Liles. The prosecutor objected to the defense calling Chaya because she was not on the defendant's list of witnesses. Karlin said that he did not know what the substance of Chaya's testimony would be, but that he had learned during Chinyere's testimony that Chaya was present when the victim was struck; he wanted her to testify about who was present and what she saw. The judge overruled the State's objection.

Chaya Liles testified that she saw Douglas coming out of the building on March 25. Thatisha yelled to Latanya upstairs, telling her that she saw the man. Latanya came downstairs, and Chaya, Kirby Allen, Chinyere, and Thatisha chased the man over to the rowhouses. They stopped the man and Allen asked, "Are you sure this is the man?" Thatisha replied, "Yes." The man was going to swing at Chinyere; Allen hit him on the left side of his jaw, and he fell to the ground. Chinyere then picked up a brick and dropped it on the man's head; it bounced off his head onto Chaya's feet.

Latanya arrived, carrying a baseball bat, and Chaya told her that the man was already on the ground. Latanya gave Chaya the bat and told her to take it back home. Chaya gave the bat to Allen, who left with it. Latanya went to the phone to call the police; the defendant then arrived. The defendant had not been present when the man was hit.

The State called three rebuttal witnesses: Detective Smulevitz, Detective Dorich, and Monica Chow. Detective Smulevitz was called to explain his misunderstanding with Ezille Ross at the police station. Smulevitz admitted that he had twisted Ross' arm and handcuffed him to the wall after Ross took a swing at him. He testified that a few moments later, he came back into the room and apologized to Ross.

Detective Dorich testified that he interviewed Thatisha Blandin at the police station on the night of the incident, and she told him that she had not seen anyone hit or beat the victim. She also did not mention that Chinyere had dropped a brick on the victim.

Dorich testified that he had also interviewed Alonzo Bell at the police station. Bell said that he had seen someone strike the victim, but he did not say that it was Kirby Allen; rather, he said that it was an unknown black male.

Dorich also said that he had interviewed Tara Liles at the station. She told him that the defendant was present when Douglas was hit. She did not say that either Chinyere or Kirby Allen had hit the victim.

Monica Chow, an official court reporter, testified that she prepared a transcript of a hearing on September 18, 1989, at which Chinyere Liles had testified. Chow said that Chinyere had testified that the defendant was present at the scene and was asking Douglas about their belongings.

The defendant maintains that he was denied his right under the sixth amendment to the United States Constitution "to have the assistance of counsel for his defense." (U.S. Const., amend. VI.) In *Peo-*

*ple v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, the Illinois Supreme Court adopted the two-pronged standard of review for ineffective assistance of counsel claims enunciated by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052: A defendant must show (1) that his counsel's performance was so deficient that it fell below an objective standard of reasonableness; *and* (2) that his counsel's performance so prejudiced his defense as to deny him a fair trial. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

The benchmark for judging a claim of ineffective assistance of counsel is whether defense counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.) Moreover, to succeed on such a claim, a defendant must overcome the strong presumption that the challenged actions might be considered sound trial strategy. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

A reviewing court need not determine whether defense counsel's performance was deficient if it determines that the defendant suffered no prejudice as a result of the alleged deficiencies. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, *** that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

The defendant first alleges that Karlin's cross-examination of Terrence Fulton prejudiced him. Before addressing the defendant's specific references to Karlin's cross-examination of Fulton, it is appropriate to note that before Fulton testified, Karlin told the judge that he was not prepared to cross-examine Fulton because he had just received the transcript containing Fulton's testimony that morning and had not had adequate time to examine the transcript. That statement was false. It was later established that Karlin had had a transcript containing Fulton's testimony at the previous trial for several weeks.

■ The defendant specifically complains that Karlin confused the jury and failed to impeach Fulton while questioning him about the location of items depicted in photographs of the scene. Indeed, the judge told Karlin that this series of questions was confusing; Karlin responded, "I do whatever I can to try *** to get to the degree of the intelligence of the witness." An examination of this portion of the record, however, reveals that Karlin was attempting to show that the witness would have been unable to see the scene of the crime from the window he claimed he was leaning out of when he observed the

incident. Later Karlin established that the window Fulton claimed he had leaned out of to see the incident had a screen in it at the time.

Additionally, Karlin brought out that Fulton did not tell the police at the scene that the defendant, who was sitting nearby, was the person who hit the victim; Fulton admitted that he did not identify the defendant as the perpetrator until he was at the police station.

The defendant also argues that Karlin bolstered Fulton's credibility by repeating his direct testimony, and that he also brought out the fact that Fulton knew the defendant's family because they had been involved in a feud with another family in the neighborhood. The defendant argues that eliciting statements which bolster the testimony of the chief State's witness falls below the standards required of effective representation, citing *People v. Lee* (1989), 185 Ill. App. 3d 420, 541 N.E.2d 747.

*Lee*, however, does not hold that counsel who elicits *any* prior consistent statements on cross-examination is ineffective as a matter of law. In *Lee*, the defense counsel elicited the most damaging testimony of all from the defendant's accomplice: specific, detailed testimony about how he saw and helped the defendant commit the crime. Additionally, defense counsel "repeatedly obtained an answer helpful to his client's case and then *led* the witness to recant the helpful answer." (Emphasis in original.) (*Lee*, 185 Ill. App. 3d at 441-42.) Defense counsel in *Lee* further brought out testimony that the witness had spoken with the police about the incident 12 times and had told them the same basic story each time. *Lee*, 185 Ill. App. 3d at 443.

Here, Karlin did unnecessarily repeat portions of Fulton's grand jury testimony; however, the record shows that he was attempting to impeach Fulton by showing that before the grand jury Fulton was asked, "Who hit? Who hit the man with the bat, the man or woman?" and Fulton replied, "I don't know." Unfortunately for the defendant, the prosecutor was able to establish that the next question asked of Fulton before the grand jury was, "Was it a man or a woman?" and Fulton replied, "A man."

Karlin also asked Fulton how he knew the defendant's family; Fulton replied that he met the defendant's family when they were fighting with another family. Contrary to the defendant's argument, that testimony was inconsequential. Moreover, it came out while Karlin was establishing that although Fulton knew the defendant's name before testifying before the grand jury, he did not mention the defendant's name during that testimony; he simply referred to "the boy" or "the man." Karlin did show that when Fulton was directly asked before the grand jury, "Who did you see hit whom with the

bat," Fulton replied, "I don't know his name." We judge that the cross-examination of Fulton did not fall below the accepted standards of *Strickland*.

After Thatisha Blandin testified, Karlin told the judge that he wished to call an additional witness, Chaya Liles. The State objected, arguing that Chaya was not on the defendant's list of witnesses. Karlin said that he had not interviewed Chaya because he did not know that she was present when the victim was struck. He said that he learned during Chinyere's testimony Chaya was present, and he wanted to call Chaya to testify about who was present and what she saw. The defendant now maintains that Karlin's failure to interview Chaya before putting her on the stand constituted ineffective assistance.

■ Initially, we note that, like the trial judge, we will not accept on blind faith Karlin's statement that he had not interviewed Chaya or that he first learned of Chaya's presence at the scene during the testimony of Chinyere Liles that morning. Although the transcript of the proceedings before Judge Urso is not in the record, the record does disclose that Chinyere Liles testified on the motion for a new trial. We find it hard to believe that Karlin did not interview Chinyere Liles before she testified on the motion for a new trial before Judge Urso (or that he did not interview Chinyere Liles before she testified in the jury trial before Judge Berkos), and we find it hard to believe that the interview would not disclose the presence of Chaya Liles at the scene.[2] Consequently, Karlin's statement that he did not know of Chaya Liles' involvement until Chinyere Liles testified at the jury trial is very hard to believe.

Moreover, Chaya's testimony was, in fact, consistent with that of Latanya, Chinyere and Thatisha. Her testimony supported the defense theory that Kirby Allen punched the victim, the victim fell to the ground, and Chinyere dropped a brick on the victim's head. She also testified that the defendant was not present when the victim was hit; she said that he did not arrive until Latanya went to the phone to call the police.

In general, whether to call a particular witness is a matter of trial strategy, and such a decision will not support a claim of ineffective representation. (*People v. Flores* (1989), 128 Ill. 2d 66, 538 N.E.2d 481.) The bulk of her direct testimony lent support to the

---

[2]Latanya Liles and Thatisha Blandin also named Chaya Liles in their testimony.

defense theory. Thus, defense counsel's tactical decision to call Chaya did not substantially prejudice the defendant and did not constitute ineffective assistance of counsel.

The defendant also argues that his attorneys demonstrated their ineffectiveness by calling six witnesses, each of whose testimony contradicted the testimony of the other defense witnesses to some extent.

■ The testimony of the defense witnesses differed on some points. Latanya testified that she came within three or four feet of the victim; Alonzo Bell said that Latanya never came closer than 25 feet from the victim; Tara said that Latanya was about 12 feet from the victim. Bell testified that he saw Kirby Allen punch the victim. Although Chinyere, Chaya, and Thatisha also saw Kirby Allen punch the victim, neither Latanya nor Tara saw this. Latanya admitted that she had a bat with her, but said that it was not the bat presented in court; her bat was a new Louisville Slugger, and the bat presented in court was a Worth brand bat. Tara, however, testified that she never saw Latanya carrying a baseball bat while they were outside. In our judgment these discrepancies in the witnesses' testimony were minor.

Although the testimony of the defense witnesses in this case was inconsistent on some points, there were certain common themes running through their testimony. For instance, most of the defense witnesses testified that Latanya had a bat, that Kirby Allen punched the victim, that Chinyere dropped a brick on the victim's head, and that the defendant did not arrive on the scene until after the victim was lying on the ground. The defense witnesses might not have presented a convincing story that Chinyere killed the victim with a brick, but their testimony may have been intended simply to suggest that perhaps Kirby Allen or Latanya assaulted Douglas and to create a reasonable doubt about whether the State had prosecuted the right person. We judge that the defendant has failed to demonstrate that a different result would have been obtained without these witnesses' testimony, and he has also failed to overcome the strong presumption that the decision to call these witnesses was sound trial strategy.

Last, the defendant complains of the trial judge's admonishments to Karlin, his issuance of two contempt orders against Karlin, and his remark to the jury after they had rendered their verdict that this was "absolutely the most disruptive, discourteous, unprofessional trial" over which he had presided, and that Karlin was "an absolute disgrace to the profession of law."

It is unclear whether the defendant contends that the trial judge's remarks and hostility toward Karlin improperly influenced the jury, or whether his remarks and his issuance of two contempt citations are simply evidence of Karlin's incompetence. The defendant seems to argue that the trial judge's remarks demonstrate that he thought Karlin was ineffective. If, however, the defendant is maintaining that the trial judge's remarks improperly influenced the jury, we note that the remarks made by the trial judge during trial, which were entirely justified, were made out of the presence of the jury and did nothing to abate the fervor with which Karlin continued to represent the defendant. (*Cf. People v. Connor* (1988), 177 Ill. App. 3d 532, 532 N.E.2d 520.) To the contrary. Moreover, the judge pointedly observed at the hearing on the post-trial motion that while Karlin's conduct was "totally unprofessional" and "totally discourteous," he added, "I didn't say anything about him being incompetent." The judge then denied the post-trial motion which was based on ineffective assistance of counsel.

We judge that Karlin's performance did not fall below an objective standard of reasonableness. He made opening statements, frequent and vehement objections, to some extent conducted effective cross-examination of the State's witnesses, moved for a mistrial at least three times and tried to rearrange the order of witnesses to his advantage. He even tried to convince the jury that the judge was treating him unfairly, sometimes a successful trial tactic. His performance, although far from perfect, did not represent ineffective assistance of counsel that would justify an order of a new trial.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and LaPORTA, JJ., concur.