**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 200384-U

Order filed October 25, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0384 Circuit No. 18-CF-588 |
| | ) | |
| JAMAL J. YOUNGER, | ) ) | Honorable Kevin W. Lyons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ALBRECHT delivered the judgment of the court.
Justices Peterson and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*: (1) The court did not err in denying defendant's untimely request to represent himself. (2) The court did not err in permitting the introduction of other-crimes evidence because general similarities existed between the subsequent crime and the one from which defendant appeals his conviction. (3) The State satisfied its good faith requirement of proving the witness's unavailability to introduce prior testimony. (4) Defendant's trial counsel was not ineffective in failing to object to the introduction of relevant Facebook activity and internet searches. (5) The court appropriately rejected defendant's request for a supplemental jury instruction. (6) A pandemic-related month-long delay in defendant's second trial did not result in cumulative error. (7) The court's sentence of 66 years' imprisonment was not excessive.

¶ 2        In the direct appeal of his first-degree murder conviction, defendant, Jamal J. Younger, argues that the Peoria County circuit court committed error by improperly admitting other-crimes evidence, denying his right to self-representation, erroneously withholding a supplemental jury instruction concerning intent, and issuing an excessive sentence that ignored statutory mitigating factors. He also asserts the introduction of his girlfriend's prior testimony violated his confrontation rights and the Illinois Rules of Evidence and his trial counsel was ineffective for failing to object to the introduction of certain evidence. He also contends cumulative error based in part on a month-long delay in the trial that resulted in his conviction. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                                A. Brief Overview

¶ 5        Defendant was charged with first-degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) for the death of Jordan Allison. Allison was shot and killed during the early morning hours of September 2, 2018, in Peoria, Illinois. He was 21 years old. Defendant was convicted on an accountability theory after the conclusion of his second trial. His first trial resulted in a hung jury.

¶ 6        The evidence and testimony adduced at both trials painted the same factual background for the charged offense. On September 2, 2018, defendant drove his girlfriend, Josie Williams's white Pontiac Grand Am to a McDonald's near North Peoria Avenue at around 3:00 a.m. Several passengers were in the vehicle, including Laeland Howard. When exiting the McDonald's parking lot, defendant initially signaled to make a right turn, but Howard instructed him to turn left. Defendant heeded Howard's request. According to defendant, once he came to a stop, Howard fired shots from a semi-automatic pistol at a nearby car. Defendant maintained that he did not know Howard was going to shoot when he instructed defendant to turn left.

2

¶ 7    Allison was sitting in the backseat of a burgundy Oldsmobile Alero that had just passed by defendant's vehicle in the McDonald's parking lot. Defendant came upon the Alero on the corner of a nearby intersection. A shot from defendant's car pierced through the Alero's license plate, through the backseat, and into Allison's back, severing his aorta. Allison's girlfriend, Trinity Blake, was in the vehicle with him and attempted to tend to him after the shooting, but Allison quickly became unresponsive. He was pronounced dead upon arrival at a nearby hospital.

¶ 8    On January 22, 2020, the defense filed a motion *in limine* to bar the admission of other-crimes evidence, wherein the State sought to admit evidence of two additional shootings allegedly associated with defendant. One of the shootings, referred to as the "New York Avenue shooting," occurred on July 29, 2018. Gun shell casings recovered from the New York Avenue crime scene matched those from the gun used in the Allison shooting. Defendant did not dispute involvement in the New York Avenue shooting but argued that he was a passenger and not the driver despite a confession to the contrary. The "Taft shooting" occurred later the same day as the Allison shooting near the Taft Homes, a public housing project in Peoria, Illinois. There, defendant and another passenger purportedly used Williams's vehicle to chase two individuals in separate vehicles, and a passenger fired gunshots from the Grand Am after a heated verbal altercation and an exchange of dirty looks. One of the chased vehicles crashed into a roadside pole.

¶ 9    The circuit court heard arguments on defendant's motion the following day. Defendant repeatedly challenged the State's recitation of the Taft shooting, interrupting the State during its argument to assert that he was not involved in that crime. The court also noted that while the State was arguing, defendant was interruptive by "laughing, shaking [his] head ***, [and]

3

gesticulating." The court denied the defendant's motion in a written order. In explaining that the probative value of these shootings outweighed the prejudicial effect, the court stated that "at the very least" the evidence of the shootings can be used "to help shore up the State's position that defendant's conduct at the time of the shooting in the case was not one of 'mistake', [*sic*] was intended conduct, and helps identify the defendant as a legally accountable perpetrator of the pending crime of First Degree Murder."

¶ 10                                    B. First Trial

Defendant's first jury trial began on January 27, 2020, and ended with the court declaring a mistrial due to a deadlocked jury. Before this decision was made, the jury submitted two notes to the court during deliberations. One note centered on the Illinois Pattern Jury Instruction for the accountability theory, where the jurors asked whether the portion of the instruction involving the "intent to promote or facilitate refer[s] to the person legally responsible or the other person?" See Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Oct. 28, 2016) (hereinafter IPI Criminal No. 503).

¶ 11          Before his second trial, defendant moved to bar the State from introducing testimony adduced from Williams at defendant's first trial based on the State's asserted inability to locate Williams. The court heard from Assistant State's Attorney Investigator Michael Hirsch who proffered his efforts to locate Williams to the court. According to Hirsch, through his investigation, he found out that Williams left the state to live in Wisconsin with her aunt. Hirsh listened to weekly jail phone calls between defendant and Williams, retained a paper trail service, and contacted the post office in attempts to locate her Wisconsin address. He also met with Williams's mother and father, providing her father with the trial subpoena. Neither parent, according to Hirsch, knew of Williams's new address and her father stated "you can't really do

4

this" in reference to the subpoena. Hirsch also left Williams text messages and voicemails on her cellular phone, but he did not receive a response. However, Williams spoke with defendant concerning the contents of the messages in jail recorded phone calls, indicating she received the messages. Williams conveyed to defendant an awareness that an investigator was trying to contact her and claimed this investigator was harassing her family members. In another call, Williams communicated that the State "can't get me now, because I'm not available" and that the service given to her father "really wasn't legal service" necessitating her presence at trial.

¶ 12 Hirsch also explained that he signed up for VINELink, a national victim notification network, which would provide notice should Williams be arrested. At the time of the hearing, he checked her social media and ran database searches "every day" on her. Hirsch confirmed that investigators listened to all jail phone calls between defendant and Williams in an attempt to locate her. The court also noted that Williams was properly served for the original second trial date. Based on Hirsch's proffer, the court found that the State's efforts constituted a good faith effort to procure Williams's attendance and permitted her prior trial testimony to be admitted at defendant's second trial due to her unavailability. See Ill. R. Evid. 804(a)(5) (eff. Jan. 1, 2011).

¶ 13                                C. Second Trial

¶ 14 Defendant's second trial began on July 20, 2020. Before the jury was selected, defendant stated that he hoped there were "African Americans in that jury, because I'm not going with 12 white people for the record," later adding "I'm not going with 12 Caucasians. I want diversity on my jury. I need minorities on my jury." Defendant stated the court should permit him to leave the courtroom until the jury selection commenced. The court admonished defendant for this behavior.

5

¶ 15        During the first two days of trial, the State presented the bulk of their case-in-chief against defendant. It introduced evidence from the New York Avenue shooting, including the testimony of Officer Jerry James Jr., who was dispatched to the scene during the afternoon on July 29, 2018. Once at the scene, James testified that he spoke with several witnesses and recovered two .40 caliber shell casings from the street. Richard Mitchell, one of the interviewed witnesses, testified that on July 29, 2018, he heard the rev of engines and what he thought were firecrackers before he saw a beige Impala and a small SUV approaching his home on New York Avenue at "high[ ] speed[s]." The passenger in the Impala leaned out of the window and shot in the direction of the other vehicle, and the passengers from the SUV returned fire. Mitchell promptly called 911.

¶ 16        Detective Roberto Vasquez testified that he assisted with the investigation of the New York Avenue shooting. Vasquez secured surveillance video footage from a nearby home that revealed a rear passenger on the driver's side of the beige vehicle leaned out the window and discharged a firearm. He further testified that on July 31, 2018, he met with defendant at a local hospital while defendant was undergoing treatment for an unrelated injury. Defendant initially denied any involvement in the New York Avenue shooting, but after Vasquez informed him that the incident was caught on surveillance camera, he confessed to driving the Impala. He also identified the passenger who was shooting from the rear passenger seat as "Bama." At trial, defendant confessed that "Bama" was a made-up name he used to conceal Howard's identity and that Howard was in fact the shooter. At the conclusion of Vazquez's testimony defendant stated the detective was "lying in front of the jury" and he never confessed to driving the Impala. Before a recess was taken, defendant ignored the court's admonishment to behave, interjecting "Why is [Vazquez] lying in front of the jury? He's a clown."

¶ 17    John Harris, who resided on North Peoria Avenue the day of the Allison shooting, testified that he heard gunshots around 3:00 a.m. that morning. He reviewed his surveillance camera footage and saw two cars positioned in a nearby intersection with one of the car's passengers raising a hand. Harris observed "flashes" from that hand. Officer Travis Ellefritz was the first officer to arrive at the scene. At the time of his arrival, all that remained at the scene were four .40 caliber shell casings, which he secured before assisting in the download of Harris's surveillance footage. Officer Paul Tuttle, a member of the City of Peoria's Crime Scene Unit, took photographs of the crime scene and collected the shell casings. Tuttle also went to the hospital where Allison was brought. There, he took photographs of the damaged Alero and was given the bullet recovered from Allison's pathologist. The casings recovered from the Allison shooting were identical to the shell casings recovered from the New York Avenue shooting. A State forensic scientist testified that he examined the casings from these shootings and concluded they were discharged from the same firearm.

¶ 18    Allison's girlfriend, Blake, testified that she picked up Allison in her Alero around 11:00 p.m. on September 1, 2018, after he finished his shift at Arby's. Blake and Allison then met up with Allison's cousin, Richard "Rico" Brown, at a party. After the party's conclusion, the three agreed to drive to McDonald's with Brown as the driver, Blake in the front passenger seat, and Allison in the back seat. However, the group decided against ordering food after noting the long drive-through line. The trio made a quick stop at a nearby gas station before Brown turned onto Archer and North Peoria Avenue. Blake was falling asleep when she heard the back window of the car shattering. When she looked to the back seat, Allison told her he had been shot and began to remove his shirt but quickly became unresponsive. Brown rushed to a nearby hospital where

7

Allison was pronounced dead on arrival. An autopsy revealed Allison's cause of death was the gunshot wound to his torso.

¶ 19      The parties reconvened in defendant's absence for a third day of trial on July 22, 2020, but the trial was postponed due to COVID-19-related issues in the Peoria County Jail where defendant was incarcerated. The court suspended proceedings until August 24, 2020, and admonished the jurors that they should not discuss the case during the recess.

¶ 20      Shortly after the trial resumed, defendant informed the court he would like to proceed without his attorney. According to defendant, he felt he would "do good representing [himself], do better" than his counsel. Defendant's counsel stated that his client was upset concerning the handling of the COVID-19-related delay. The court permitted defendant to explain his sudden request through an oral motion to the court. The colloquy between the court and defendant concluded:

"DEFENDANT: It just – and like another thing, I just feel like there's questions that should be asked that [defense counsel] got his reasons that he don't want to ask them, but, you know, this is, like, kind of like determining the rest of my life so I feel like these questions need to be asked, and –

THE COURT: Well –

DEFENDANT: – if he don't want to ask them, I will ask them myself, like, in cross-examination of witnesses and stuff.

THE COURT: You have every opportunity to raise whatever questions you have with [defense counsel] and him, he can have a conversation with you, but not only does that claim seem to be disingenuous, you've had one trial, Mr. Younger, so it's not as though anything has popped up that has been new so

8

unlike other defendants who are watching it unfold in front of them, it's unfolded in front of you already and in terms of testimony and questions and answers.

And now these people are being called back to testify again, and *we're in day three of your second trial, and it is so totally illogical* and – and the *optics of it are terrible*, but even if I could get beyond that, the optics being that a jury would – regardless of what I'd ever say to them or not say to them, the jury would – would have to conclude well, didn't we start this with the Defendant having a lawyer and now he doesn't have a lawyer and he's doing it on his own? What's going on here?" (Emphasis added.)

The court denied defendant's request reiterating the choice to proceed self-represented would result in terrible "optics."

¶ 21     The State continued with its case-in-chief by introducing Williams's testimony from the first trial, which was read to the jury. Williams testified that she was in a relationship with defendant during the summer and fall of 2018. Defendant went by various nicknames—she called him Peter, and he had a Facebook account under the moniker Foskii Cosby. She further testified that she owned a white 2002 Pontiac Grand Am at this time and often let defendant drive her car. Defendant borrowed Williams's car on September 1, 2018, and returned it to her the following morning. Defendant again borrowed her car after dropping her off at work on September 2, 2018. That day, upon defendant's request and subsequent to the Taft shooting, Williams filed a false police report indicating that her Grand Am was stolen. On September 3, 2018, when the Peoria police contacted Williams and indicated she would be arrested for obstructing justice, she eventually admitted that defendant had been in possession of her car.

¶ 22        Detective Clint Rezac then testified that he collected surveillance footage from various local businesses and residences depicting the Allison shooting, a compilation of which was shown to the jury. He testified the footage depicted distinct characteristics from Williams's car, including a missing hubcap and hanging trim, which aided in his investigation. Rezac contacted Williams who provided him with information leading to defendant's Facebook page and led Rezac to defendant. The State introduced a video recorded interrogation that Rezac conducted with defendant at the Peoria Police Department on September 17, 2018, where defendant admitted to driving Williams's car on the morning of Allison's murder. Although he repeatedly denied anyone shot a firearm from the vehicle during his interrogation, he eventually admitted to Howard firing the shots.

¶ 23        Rezac also subpoenaed defendant's Facebook account. The record revealed that on the day of the crime, defendant shared a Peoria Journal Star article on his page concerning Allison's murder. The State also introduced a Facebook message from an account defendant controlled offering to sell a .40 caliber semi-automatic pistol the day after Allison's murder —the same type of gun linked to the bullet casings recovered from the New York Avenue and Allison shootings. It then introduced defendant's internet searches from his cellular phone conducted during the evening of September 2, 2018, in which defendant was researching .40 caliber ammunition prices.

¶ 24        Next, the State introduced evidence of the Taft shooting. Jayson Davis testified that during the evening of September 2, 2018, he was at the Taft housing complex helping a friend unload groceries when a white Pontiac Grand Am approached him. A passenger got out of the Grand Am and asked Davis what he was looking at. The two men exchanged unpleasant verbal remarks before the passenger returned to the Grand Am and drove away. Shortly thereafter,

Davis's uncle arrived at the housing complex in his dark blue Cadillac. Davis returned to his own vehicle and began following his uncle on their way out of the complex when the Grand Am returned. As the Grand Am passed Davis's and his uncle's vehicles, the passenger, who Davis believed was the same person with whom he'd just had a verbal altercation, began to shoot in their direction. Davis stopped his vehicle and ducked. Meanwhile, his uncle crashed his Cadillac into a nearby building and downed a telephone pole. Davis informed Detective William Calbow that the Grand Am had either "rust or dirt" on it and was missing a hubcap on the front driver's side. When asked for a description of the suspects, Davis admitted while testifying that he "didn't really see the driver" and asserted that he did not believe defendant was in the vehicle. However, while at the crime scene he described the driver of the Grand Am with physical characteristics matching defendant's appearance at the time of the offense—light-skinned, dreadlocks, with a bushy beard.

¶ 25 Officer Joseph Smiles investigated the Taft shooting and located a white Pontiac Grand Am in disrepair and a missing hubcap approximately ten blocks away from the housing project. Calbow brought Davis to the Grand Am, and Davis identified it as the vehicle used in the shooting. Detective Matt Mocilin also assisted with the Taft shooting investigation. According to Mocilin, during the September 17, 2018, interrogation, defendant admitted to driving Williams's Grand Am during the evening of the Taft shootings, although he did not specify the time at which he was driving. Defendant confessed further that at some point that evening, he, his friend Jordan Logan, and Howard drove the Grand Am from the Taft housing projects to Walmart before returning to the complex.

¶ 26 The parties stipulated to the introduction of a jail phone call between defendant and Logan from October 2018, approximately a month after Allison's murder and the Taft shooting,

11

during which the two discussed the State's allegations. The defendant told Logan that "they got me on camera" and described the car at the Taft shooting as a "blue Cadillac." The State emphasized that at no point did an investigating officer share the Cadillac's color when questioning defendant and argued that defendant's identification of such during this phone call affirmatively placed him at the Taft shooting.

¶ 27    Following the State's case-in-chief, defendant testified. Concerning the New York Avenue shooting, defendant explained that he was accompanied by a couple of his friends, including Howard, who was seated in the backseat and shot at the silver SUV. Defendant disputed Vasquez's testimony that he confessed to being the driver for the shooting. Rather, defendant maintained that he was a passenger. During cross-examination the State introduced a prior inconsistent statement from defendant's first trial where he indicated he was indeed the driver.

¶ 28    Concerning the charged offense, defendant admitted that he lied to Rezac when denying that someone shot a firearm from his vehicle. He did so to protect himself and his friend. He testified that Howard indeed shot at the Alero resulting in Allison's death but maintained that he did not know Howard was going to shoot and was merely following Howard's directions when they came upon Blake's vehicle. Defendant denied any involvement in the Taft shooting. He testified that Howard and Logan took Williams's vehicle to the store. Afterwards, they picked up defendant, and the group went to Walmart before returning to the Taft housing complex. According to defendant, no shots were fired from the Grand Am while he was in it that evening.

¶ 29    During the jury instruction conference, the court heard argument on defense counsel's submitted supplemental instruction, Illinois Pattern Jury Instructions, Criminal, No. 5.01A

(approved Oct. 28, 2016) (hereinafter IPI Criminal No. 5.01A), regarding the definition of intent. The instruction defined intent as follows:

> "A person acts with intent to accomplish a result or engage in conduct when the conscious objective or purpose is to accomplish that result or engage in that conduct." IPI Criminal No. 5.01A.

¶ 30    The court expressed skepticism whether IPI Criminal No. 5.01A accurately portrayed the law, stating that

> "a person that intended great bodily harm or even didn't intend, but knew that what they did created a strong probability of death or of great bodily harm is guilty of that result, and that's why I think that the legislature so carefully chooses its words, and the – the charge that needs to be proven here is not that the Defendant intended a result of death."

Later, the court added, "So I think that the – the [IPI Criminal No. 5.01A] instruction ['] a person acts with intent to accomplish a result or engage in conduct['] does not apply to the facts of this case and the first degree murder the Defendant is charged with." The court rejected the supplemental instruction.

¶ 31    The defendant interrupted the State multiple times during its closing argument rebuttal. Before being escorted from the courtroom, he accused the State of lying, revealed a wristband to the jury by raising his right wrist and requested a mistrial. After closing arguments, the jury was instructed pursuant to IPI Criminal No. 503 on the accountability theory, which stated in pertinent part:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of the offense, and with the intent to

13

promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." IPI Criminal No. 503.

On August 25, 2020, the jury found defendant guilty.

¶ 32                                 D. Sentencing

¶ 33        A month later, the court sentenced defendant to 66 years' imprisonment. In issuing its sentence, the court explained that it considered the presentence investigation report, the evidence and arguments by counsel, the statement of allocution, the history and character of the defendant, the nature of the offense, and the aggravating and mitigating factors. The court chastised defendant for his display of self-centered petulance and "disrespectful" courtroom conduct. Specifically, it noted defendant's frequent gesturing to the public gallery, "flip[ping] the bird" on occasion, and raising his hidden-away wristband during the State's closing argument and requesting a mistrial. It remarked that defendant's courtroom antics were "rude, *** ugly, *** [and] obnoxious." The court described defendant's childhood as a "pitiful existence" and stated "[i]f there was a book to be written on how not to raise a child, you would star in it." Before issuing defendant's sentence, it also touched on his criminal history and prior incarceration during his high school years. On September 28, 2020, defendant's counsel indicated he was foregoing any motion to reconsider the court's sentence in lieu of a direct notice of appeal. Defendant timely appealed.

¶ 34                                 II. ANALYSIS

¶ 35        On appeal, defendant argues that (1) the circuit court violated his right to self-representation by forbidding him from proceeding without an attorney because he could not provide a sufficient reason to do so; (2) the prejudicial effect of admitted other-crimes evidence

14

arose to an abuse of discretion; (3) his confrontation rights were violated due to the introduction of his girlfriend's prior testimony without a showing of good-faith efforts to demonstrate her unavailability; (4) his counsel was ineffective for failing to object to the admission of a Facebook post, a Facebook message, and his cellular phone search history; (5) the circuit court erred in withholding instruction IPI Criminal No. 5.01A, that would have clarified intent for the jury; (6) cumulative error and the month-long COVID-19 delay deprived him of a fair trial; and (7) his sentence for 66 years' imprisonment was excessive because the court impermissibly focused on his in-court conduct and ignored mitigating factors. We address each of defendant's contentions in turn.

¶ 36                                    A. Denial of Self-Representation

¶ 37        The initial issue defendant presents on appeal is whether the court erred in refusing to allow him to proceed self-represented upon his request to do so after a day of testimony was completed during his second jury trial. As the parties correctly note, defendant did not appropriately preserve this error; however, the parties agree that the deprivation of the right to self-representation constitutes a structural error, and as such, is subject to the second prong of the plain error doctrine. See *People v. Albea*, 2017 IL App (2d) 150598, ¶ 28, *as modified on denial of reh'g* (Jan. 19, 2018) ("[T]he erroneous denial of self-representation at trial is structural error.").

¶ 38        A defendant has the right to self-representation under the Sixth Amendment. *Faretta v. California*, 422 U.S. 806, 819-20 (1975); U.S. Const. amend. VI. To represent oneself, a defendant must affirmatively waive one's right to counsel clearly and unequivocally. *People v. Burton*, 184 Ill. 2d 1, 21 (1998). To do so, "[a] defendant must explicitly inform the trial court he [or she] wants to proceed *pro se* ***." *Id.* at 22. The court is presented with two countervailing

15

interests when a defendant seeks to exercise their right to self-representation. Under the Sixth Amendment, a defendant has the right to effective counsel, but also the right to represent him or herself. U.S. Const. amend. VI.

¶ 39    Defendant argues that his waiver of counsel to the circuit court was clear and unequivocal. Defendant implies that the court's denial was for improper reasons. Namely, the court denied his request for the impermissible reason that defendant was not able to "articulate something" to demonstrate his competence to proceed as a self-represented litigant. Further, the court failed to conduct the appropriate Illinois Supreme Court Rule 401 admonishment. Ill. S. Ct. R. 401(a) (eff. July 1, 1984). Defendant's argument faulters because his competence was not the exclusive or even the primary reason to reject his request for self-representation.

The time a defendant chooses to invoke the right to self-representation is significant. "A number of courts have held that a defendant's request is untimely where it is first made just before the commencement of trial, *after trial begins*, or after meaningful proceedings have begun." (Emphasis added.) *Burton*, 184 Ill. 2d at 24. Even if a court considers a defendant's decision to represent himself imprudent, it must be accepted out of "that respect for the individual which is the lifeblood of the law," so long as the decision is made freely, knowingly, and intelligently. (Internal quotation marks omitted.) *People v. Lego*, 168 Ill. 2d 561, 563-64 (1995).

¶ 40    By the time defendant requested to represent himself, a majority of the State's witnesses had testified at his second trial. A request this tardy would undoubtably interfere with the orderly conclusion of his trial. Although not explicit, the court's explanations in denying defendant's request were implicitly related to the tardiness of his request. For instance, the court's statement that changing counsel this late in the trial would result in "bad optics" incidentally discusses the

16

consequence of juror confusion resulting from an untimely request. As the court initially explained to defendant, the request occurring during the "middle of a trial" came at an inappropriate time. We therefore reject any notion by defendant on appeal that the court failed to tie its denial of defendant's request to the timeliness issues.

¶ 41    Further, obstructionist misconduct is an independent means in which a defendant may forfeit his or her right to self-representation. See, *e.g.*, *People v. Rohlfs*, 368 Ill. App. 3d 540, 545 (2006). Here, defendant was kicked out of the courtroom for a profanity laced outburst, but importantly, this outburst came during closing arguments. We therefore do not weigh this episode against defendant as it post-dates his request to proceed as a self-represented litigant. *Cf. People v. Woodson*, 2011 IL App (4th) 100223, ¶ 29 (noting defendant's obstructionist behavior came after the court denied his request to proceed without an attorney and therefore, he did not forfeit his right to self-representation).

¶ 42    Disregarding his antics during closing, the record is replete with defendant's obstructionist behavior. The court ensured defendant's obstructionism was noted within the record by stating after closing arguments that "this Defendant has repeatedly gestured and big mouthed his way through pretrial hearings and now again at this trial." During the pretrial motion hearing on other-crimes evidence, defendant repeatedly challenged and interrupted the State. In another unrelated diatribe, he refused to go to trial if "12 Caucasians" comprised the jury. On his second day of trial, defendant accused Vasquez of lying about defendant's confession regarding his involvement in the New York Avenue shooting, going so far as to call Vasquez "a clown" in front of the jury.

¶ 43    A combination of an untimely request and obstructionist behavior empowers a court to refuse a defendant's request to represent him or herself, and although not binding caselaw, both

17

parties cite this court's decision in *People v. Sanchez*, which holds such. 2022 IL App (3d) 210014-U, ¶ 27 (denying request for self-representation was proper due to the combination of a pattern of obstructive behavior and the timing of the request). We find no substantial differences distinguishing that matter from the case at hand. Further, none of defendant's cited cases involve a request to represent oneself after the commencement of trial. See *Albea*, 2017 IL App (2d) 150598, ¶¶ 4-6, 24; see also *Woodson*, 2011 IL App (4th) 100223, ¶ 24 (citing *People v. Ward*, 208 Ill. App. 3d 1073, 1084 (1991)) (explaining a request to represent oneself may come so late in the proceedings that to grant it would be impermissibly disruptive). Having found no error, a second-prong analysis under the plain error doctrine is unnecessary.

¶ 44                             B. Introduction of Other-Crimes Evidence

¶ 45        Defendant next argues the introduction and presentation of the Taft shooting as other-crimes evidence is reversible error because (1) the shooting was irrelevant as the State failed to prove defendant's involvement, (2) the State's purported non-propensity purposes of lack of mistake and *modus operandi* are inapplicable, and (3) the prejudicial effect of its admission outweighed any probative value. The State replies that because the Taft shooting occurred on the same day, with an overlap of assailants, in the same vehicle, and likely with the same firearm that was used in Allison's murder, it is admissible under the *modus operandi* exception.[1] We agree with the defendant to the extent that neither of the State's asserted permissible purposes on appeal apply, but find that it was appropriately introduced to show defendant's criminal intent.

---

[1]The State provided a broad reason to rationalize the introduction of the other-crimes evidence at trial. During its opening statement it explained the crimes aided in "decid[ing] whether the Defendant is legally accountable for L[a]eland Howard in the backseat of his car pulling a gun out and shooting into the trunk of the Alero and killing Jordan Allison." The State's closing argument indicates the crimes were admitted for a narrower reason, to prove lack of mistake, by "show[ing] *** this was not a mistake. This was not an accident."

¶ 46 "It is well settled under the common law that evidence of other crimes is admissible if relevant for any purpose other than to show a defendant's propensity to commit crimes." *People v. Chapman*, 2012 IL 111896, ¶ 19. A non-exhaustive list of alternative permissible purposes include motive, intent, identity, lack of mistake, and *modus operandi*. See *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010). When a party seeks to introduce evidence of other crimes for a non-propensity purpose, a court must conduct an evidentiary balancing test "weigh[ing] the probative value of the evidence against its prejudicial effect, and [the court] may exclude the evidence if its prejudicial effect substantially outweighs its probative value." *People v. Moss*, 205 Ill. 2d 139, 156 (2001); see also Ill. R. Evid. 403 (eff. Jan. 1, 2011). The admission of other-crimes evidence will not be disturbed absent an abuse of discretion. *Chapman*, 2012 IL 111896, ¶ 19.

¶ 47 Our supreme court has established that even if the admission of other-crimes evidence was erroneous, to warrant reversal, "the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different." *People v. Hall*, 194 Ill. 2d 305, 339 (2000). Stated differently, to reverse based on the introduction of other-crimes evidence, the evidence must be so prejudicial that it effectively denied defendant a fair trial. *People v. Patterson*, 2013 IL App (4th) 120287, ¶ 59.

¶ 48 First, defendant asserts that the Taft shooting evidence is irrelevant. Defendant cites *People v. Lopez*, arguing that because the State failed to establish that defendant was a participant in the Taft shooting, its introduction is reversible error. 2014 IL App (1st) 102938-B, ¶ 1. Unlike *Lopez*, the prior crime sought to be introduced here does not rest on an impermissible purpose from the State that is "pure conjecture." *Id.* ¶ 24. The State in the case at bar introduced evidence to show defendant *may* have participated in the other crime, much like the prosecution accomplished in *Morales* (a case distinguished in *Lopez*). *Id.* ¶ 28.

19

¶ 49     The parties disagree whether Davis's testimony establishes defendant's involvement in the Taft shooting. Defendant explains that Davis did not believe defendant was in the car during the Taft shooting whereas the State points out that Davis's crime scene description identified physical features of the driver of the Grand Am that match defendant's appearance. The State also suggests that defendant could not have known the color of the crashed vehicle at the scene of the Taft shooting had he not been present. Further, the State argues it is nonsensical for defendant to place a phone call to Williams and request she report her car stolen if not for the purpose of creating an alibi.

¶ 50     In *Morales*, the State introduced evidence of an attack that occurred at the same parking lot of a tortilla factory during the same month of the murder and robbery that defendant was on trial for. *People v. Morales*, 2012 IL App (1st) 101911, ¶ 30. Analogizing this matter to *Morales*, the testimony of defendant's involvement with the other crime was subject to debate following cross-examination, but it nonetheless presented a question of fact for the jury. *Id.* ¶ 31. Defendant's possible participation made evidence of the incident relevant to the permissible purpose. *Id.* ¶ 32.

¶ 51     Second, defendant argues that even if the Taft shooting is relevant and the State's evidence is sufficient to connect defendant to the shooting, its admission was prejudicial. Centrally, because the shooting occurred after the instant offense, it could not support the State's lack of mistake purpose. The *modus operandi* exception is also inapplicable, defendant asserts, because defendant's identity is not in dispute and the Taft shooting was not indicative of a distinctive criminal pattern. The time, place, and manner of the Allison shooting and the Taft shooting are distinct. No bullet shell casings were recovered from the Taft shooting that connect the event to the Allison shooting. Finally, the defendant claims the admission of this evidence

20

was not harmless error, as there was not clear evidence of guilt, because the first trial resulted in a hung jury.

¶ 52    However, as previously mentioned, the State used the Taft shooting in an attempt to prove defendant had the requisite intent at the time of the charged offense. In that sense, the circumstances behind the Taft shooting's admission bears similarity to *People v. Cavazos*, 2015 IL App (2d) 120444, ¶¶ 40, 71, *appeal denied*, *vacated on other grounds*, 183 N.E.3d 866 (Ill. 2021), holding the introduction of another shooting that a defendant gang member was involved in later on the same day of the charged offense was relevant and probative to prove defendant's intent for the underlying crime. In *Cavazos*, defendant was tried for first-degree and attempted murder on the theory of accountability for his involvement in the shooting of a rival gang member and his girlfriend. *Id.* ¶¶ 1, 19, 71. On January 20, 2007, defendant handed his brother a .40 caliber semi-automatic handgun which his brother discharged from their vehicle killing one and injuring another. *Id.* ¶¶ 19, 40. Later that day, defendant shot a bar patron at the behest of his fellow gang members, when one of his accomplices identified the patron as a rival gang member. *Id.* ¶ 40. The Second District held that the admission of this subsequent bad act was relevant to defendant's intent, namely, to help the State prove that defendant "*shared* [his brother's] intent to commit first-degree and attempted murder." *Id.* ¶ 71.

¶ 53    Our supreme court has previously found as much in *People v. McKibbins*, 96 Ill. 2d 176, 185-86 (1983), which the State cites on appeal, to support that asserting only general similarities between crimes are required when the other offense is offered to prove the presence of criminal intent as opposed to proving the commission of the crime charged. If general similarities between the crimes are proven, evidence of defendant's involvement may be shown to establish the necessary criminal intent in the offense charged. *Id.* at 186. For instance, the *McKibbins* court

21

held the introduction of evidence that defendant was involved in another armed robbery with the same accomplices days after the charged offense dispelled "any idea that defendant had been somehow innocently involved in the" charged offense. *Id.*

¶ 54    In *Bartall*, a decision issued the same year as *McKibbins*, the supreme court explained that another crime may only be introduced when it bears some threshold similarity to the crime charged. *People v. Bartall*, 98 Ill. 2d 294, 310 (1983). The similarity between the two offenses increases the relevance and ensures it is not used to establish a pattern of criminal propensities. See *id.* The principal issue in *Bartall* was whether the defendant shot the victim with the requisite mental state required for murder. *Id.* To meet its burden, the State introduced another crime where 20 hours after the charged offense, defendant shot at another driver in a fit of unprovoked road rage. *Id.* at 302-03, 309. The court noted the shooting was sufficiently similar to the charged offense to make it admissible on the issue of intent; both incidents involved the defendant firing the same handgun out of the window of his vehicle while he drove on the same street in Chicago. *Id.* at 310-11. "[T]he two incidents, taken together" within 24 hours of each other, the court concluded, "increase the certainty that the defendant deliberately acted in this fashion." *Id.* at 311-12.

¶ 55    Applying these principles to the instant case, evidence of defendant's presence and involvement at the Taft shooting would tend to combat defendant's contention that he did not know a passenger from his car would indeed discharge a firearm during the commission of the charged offense. In essence, the similarities between the New York Avenue shooting, the Taft shooting, and the charged offense contradicts any purported surprise that a passenger would discharge a firearm outside the vehicle that defendant was driving.

22

¶ 56        Davis's description of the driver and defendant's correct identification of the crashed vehicle as a "blue Cadillac" during his October jail phone call with Logan, while not conclusive, are sufficient to place the question of defendant's involvement in the Taft shooting before the jury. See *Morales*, 2012 IL App (1st) 101911, ¶ 31. At the Taft housing complex, the same vehicle from the Allison murder was used for a drive-by shooting a mere 16 hours later wherein a passenger began to discharge a firearm towards victims in cars. We find there are adequate similarities between that offense and the charged offense to where the former's admission did not arise to an abuse of discretion.

¶ 57        While there are discernible differences between the offenses, namely the time of day and location, its admission does not dismantle the numerous similarities between the two or diminish the highly probative insight it provides of defendant's intent from similar crimes perpetrated in near succession. As in *Cavazos*, *McKibbins*, and *Bartall*, its introduction aided the State in meeting its burden that defendant possessed the necessary criminal intent, here, to share Howard's intent to commit first-degree murder. See *Cavazos*, 2015 IL App (2d) 120444, ¶ 71.

¶ 58        Furthermore, we reject defendant's suggestion that by admitting the Taft shooting evidence, he was deprived a fair trial. Assuming *arguendo* that it was error to admit the Taft shooting, we cannot find that its introduction reached the level of prejudice to be a determinative or a material factor over his guilty conviction. Defendant does not contest the admission of the New York Avenue shooting, which he conceded involvement in, and he provided inconsistent testimony as to whether he was the driver.

¶ 59                                    C. Unavailability of Williams

¶ 60        Defendant next argues that the introduction of Williams's trial testimony from his first trial into his second trial violated the Illinois Rules of Evidence and his rights conferred from the

23

confrontation clause. The State responds that it met its burden under the Illinois Rules of Evidence to show that Williams was intentionally unavailable and therefore the court did not err in admitting her testimony.

¶ 61 The Sixth Amendment guarantees defendants the right to confront and cross-examine witnesses testifying against them. *Crawford v. Washington*, 541 U.S. 36, 51 (2004). Concerned with the protection of this right, testimonial statements from witnesses absent from trial are admitted only where (1) the witness is unavailable, and (2) defendant has had a prior opportunity to cross-examine. *Id.* at 59. Our evidentiary rules codify the same. Illinois Rule of Evidence 804 outlines circumstances a witness may be deemed unavailable, such as where "the proponent of a statement has been unable to procure the declarant's attendance *** by process or other reasonable means." Ill. R. Evid. 804(a)(5) (eff. Jan. 1, 2011). Rule 804(b)(1) allows the admission of prior testimony for an unavailable witness where the party whom the testimony is directed against "had an opportunity and similar motive to develop" the witness's testimony. *Id.* § (b)(1).

¶ 62 Our supreme court has further explained that the first requirement, the unavailability of a witness, is " 'a narrow concept, subject to a rigorous standard.' " *People v. Torres*, 2012 IL 111302, ¶ 54 (quoting *People v. Johnson*, 118 Ill. 2d 501, 509 (1987)). To meet the standard, the State must make a good faith effort to procure a witness's presence at trial. *Id.* " 'The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness' " and the State bears the burden of establishing its efforts were sufficient. *Id.* (quoting *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *overruled on other grounds by Crawford*, 541 U.S. 36). A mere unwillingness or reluctance is "not a good enough reason to permit the use of out-of-court testimony." *Johnson*, 118 Ill. 2d at 510. A circuit court's admission of former testimony and

24

ruling on witness availability are reviewed under an abuse of discretion standard. *Torres*, 2012 IL 111302, ¶ 46; see *People v. Hansen*, 352 Ill. App. 3d 40, 48 (2004).

¶ 63 Defendant analogizes this matter to *People v. Kent*, where the Second District found that the State's efforts to procure a witness for trial was insufficient to label that witness unavailable. 2020 IL App (2d) 180887, ¶ 1. There, the State made no additional efforts to obtain the witness's attendance beyond contacting the witness's uncooperative family twice. *Id.* ¶¶ 103-05. The Second District found deficient both the form in which the State proffered its good faith efforts to the lower court, *id.* ¶¶ 101-02, and the substance of the proffer, *id.* ¶¶ 103-07.

¶ 64 As to the form, defendant argues that the State's proffer of purported reasonable means was done through an impermissible summary of investigative efforts, not in sworn testimony or affidavits as required by law. See *Curt Bullock Builders, Inc. v. H.S.S. Development, Inc.*, 261 Ill. App. 3d 178, 182 (1994) (explaining defendants are entitled to have claims of unavailability supported by affidavit or testimony). As the State correctly retorts, any argument to inadequacies with the form of the State's proffer is waived under the doctrine of invited error, because defendant's trial counsel agreed to the proffer during the hearing on Williams's unavailability. *Cf. Hansen*, 352 Ill. App. 3d at 48.

¶ 65 As to substance, Hirsch was assigned to procure Williams's presence at the second trial. In his proffer to the court which narrated his efforts during the July 20, 2020, hearing, Hirsch explained Williams moved up to Wisconsin with her aunt. Investigators listened to defendant and Williams's phone calls each week and during these phone calls she disclosed that she was in Wisconsin. Hirsch also explained the myriad of avenues utilized to locate Williams, including (1) texting and leaving voicemails, (2) listening to the jail phone calls between Williams and defendant, (3) retaining paper trail services, (4) contacting the post office, (5) meeting with her

25

mother and father to inquire about her whereabouts, (6) checking her social media and running database searches daily, and (7) enrolling in VINELink to be notified if Williams were to be arrested.

¶ 66    It is inarguable that the State made more efforts to procure Williams's attendance than the prosecution did in *Kent*. The record here distinctly reflects that the State made "efforts *** to ascertain whether [Williams] resided elsewhere, attended school, or was employed." *Kent*, 2020 IL App (2d) 180887, ¶ 105. Indeed, defendant does not indicate what additional efforts the State could have reasonably made to secure Williams's attendance. We therefore hold that the court did not abuse its discretion in finding the State's efforts reasonable and in admitting Williams's prior testimony.

¶ 67    D. Admission of Facebook Activity and Internet Search History

¶ 68    Defendant also argues that the Facebook message where he sought to sell a gun, the Facebook post sharing a news article about Allison's death, and the internet searches for ammunition were all inadmissible, and it was ineffective assistance for his trial counsel's failure to object to the introduction of this evidence.

¶ 69    The right to effective assistance of counsel is guaranteed through the Sixth Amendment and article I, section 8 of the Illinois Constitution. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. We review a defendant's claim for ineffective assistance of counsel under the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate ineffective assistance of counsel, the defendant must show that (1) trial counsel's representation fell beneath an objective standard of reasonableness, and (2) that "counsel's performance so prejudiced his defense as to deny him a fair trial." *People v. Liles*, 232 Ill. App. 3d 433, 444 (1992). Ineffective assistance of counsel claims are subject to a two-part standard of review wherein the findings of

26

fact are reviewed against the manifest weight of the evidence, while the ultimate legal question of counsel's effectiveness is subject to *de novo* review. *People v. Klein*, 2015 IL App (3d) 130052, ¶ 70.

¶ 70        Before analyzing whether defendant's counsel was ineffective for failing to object to this evidence, we begin by evaluating defendant's threshold contention that this evidence was inadmissible. The admissibility of evidence rests within the discretion of the circuit court, and its decision will not be disturbed absent an abuse of that discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. This deferential standard of review will not result in reversal unless the circuit court's decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Peterson*, 2017 IL 120331, ¶ 125, *as modified on denial of reh'g* (Jan. 19, 2018); *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 71        Generally, evidence is admissible if it is relevant. *People v. Bryant*, 391 Ill. App. 3d 228, 244 (2009); Ill. R. Evid. 402 (eff. Jan. 1, 2011). The Illinois Rules of Evidence define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Even if relevant, a court may exercise its discretion and exclude the evidence if it finds the danger of unfair prejudice through its admission substantially outweighs any probative value. *People v. Hanson*, 238 Ill. 2d 74, 102 (2010); Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 72        Defendant argues his social media message and internet search history fail the Rule 403 balance, going so far as to say the evidence provides "low or no" probative value and "extreme prejudicial effect." Ill. R. Evid. 403 (eff. Jan. 1, 2011). First, the State introduced defendant's Facebook message selling what it purported to be the murder weapon without producing any

27

evidence supporting that claim. There is no tether between any weapon defendant sought to sell and the crime at issue. Second, the State introduced defendant's Facebook post sharing a news article of Allison's death the same day of the murder. Because defendant did not dispute being present as the driver during the Allison shooting, this post was irrelevant. Third, the introduced extraction report that features defendant's cellular phone internet searches for the price of .40 caliber ammunition at Bass Pro Shops and Walmart on September 2, 2018, at approximately 5:50 p.m. post-dated the offense. According to defendant, this evidence was used for the sole purpose to inflame the passion of the jury.

¶ 73    The State responds by asserting the attempted Facebook gun sale is relevant to show defendant's consciousness of guilt and his intention to aid and abet Howard in the Allison shooting. Evidence at trial established a .40 caliber semi-automatic pistol was used for the Allison and New York Avenue shootings. Therefore, it was also reasonable for the jury to infer that defendant needed to restock on ammo, which dispels defendant's contentions of irrelevance with the internet searches. Thus, according to the State, the internet searches and attempted Facebook sale related to the murder weapon.

¶ 74    This evidence could demonstrate a mere coincidence that during the same day of the Allison and Taft shootings, defendant had online activity relating to a similar type of weapon linked to the Allison and New York Avenue shootings. Yet "[t]he contention that a different, reasonable inference might be drawn from the same evidence does not make the inference which the State chose to argue improper or impossible." *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 43 (quoting *People v. McInnis*, 88 Ill. App. 3d 555, 575 (1980)). The evidence of defendant's attempted sale and ammo search history was relevant to the State's theory that defendant willfully participated in the aftermath of the charged offense. Defendant testified to this

28

participation, admitting that he located a shell casing from the Allison shooting in the Grand Am upon their return to the Taft Homes later that morning, which he threw out of his vehicle. This evidence also serves to disprove defendant lacked the requisite intent for the underlying crime. See Ill. R. Evid. 401 (eff. Jan. 1, 2011). Evidence of a consciousness of guilt is probative of defendant's predisposition to perform a criminal act as well as to a defendant's state of mind. See *People v. Goodman*, 55 Ill. App. 3d 294, 296 (1977).

¶ 75    We agree with the State's concession that the Facebook post was erroneously admitted. This post—a news story concerning Allison's death on the day of the shooting—provided an opportunity for the prosecution to paint defendant prejudicially as one who brags over murder. We nonetheless find its admission a harmless error. In determining whether an error is harmless, a reviewing court may (1) focus on the error to determine whether it contributed to the conviction, (2) examine other properly admitted evidence to determine whether it overwhelmingly supports conviction, or (3) determine whether the improperly admitted evidence is merely cumulative. See *In re Brandon P.*, 2014 IL 116653, ¶ 50. First, the Facebook post did not discernably contribute to the conviction. Further, the testimony adduced at trial concerning defendant's confessions to his involvement in the charged offense, the other-crimes evidence, and his willful participation in covering up this criminal activity, all serve as evidence which supports defendant's conviction. Therefore, even though improperly admitted, defendant's shared Facebook post did not rise to such a prejudicial error as to deprive him of a fair trial.

¶ 76                    E. Denial to Issue Supplemental IPI Instruction

¶ 77    Defendant next asserts the court erred in not issuing IPI Criminal No. 5.01A where defendant's counsel requested it, because intent was the main contested issue at trial and there was a potential for juror confusion over this legal concept.

¶ 78        The decision to issue a jury instruction rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *People v. Garcia*, 165 Ill. 2d 409, 432 (1995). However, *de novo* review is required when the question presented "is whether the jury instructions accurately conveyed" the law to the jury as it applies to the case. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007). The issue presented here is whether the refusal of IPI Criminal No. 5.01A deprived the jury of an accurate instruction on the intent required to convict defendant of first-degree murder, a general intent offense, and is therefore reviewed *de novo*.

¶ 79        The committee note to IPI Criminal No. 5.01A does not indicate a preference as to whether the instruction should be issued in the absence of a specific jury request. See IPI Criminal No. 5.01A, Committee Note. The note cites *People v. Powell*, 159 Ill. App. 3d 1008, 1013 (1987), which the State likens to this case, where the First District found that a specific instruction on the terms "knowingly" and "intentionally" were unneeded to clarify defendant's attempted murder instruction due to those terms' plain and ordinary meanings. Because "an accurate attempted murder instruction" was issued, "which contain[ed] the element of specific intent to kill, any alleged error in the instructions [was] minimized." *Id.*

¶ 80        Defendant argues that the alternative instruction was needed here to explain that to find defendant guilty, it must have been his conscious objective or purpose to shoot Allison or engage in the conduct of the shooter, Howard. Defendant requests this court rely on *People v. Avdic*, a First District decision finding reversible error when the trial court refused to issue IPI Criminal No. 5.01A. 2023 IL App (1st) 210848, ¶¶ 69-72.

¶ 81        The defendant in *Avdic* was convicted of one count of felony murder for the death of an individual and one count of attempted murder under an accountability theory for the wounding of another. *Id.* ¶ 1. As was done here, the court issued the accountability theory instruction, IPI

30

Criminal No. 503. *Id.* ¶ 66. The jurors submitted two clarifying questions on the instruction, though neither dealt directly with the definition of intent. *Id.* ¶¶ 13-14. The trial court refused to issue the defense counsel's proposed instruction, considering the wording of the instruction "confusing." *Id.* ¶ 69. The appellate court disagreed and found the court erred in refusing the instruction for the attempted murder charge considering that each charged offense required a different level of intent (general intent for the felony murder, specific intent for the attempted murder) and the lack of evidence presented on specific intent required for attempted murder in that case. *Id.* ¶ 72.

¶ 82    The instant case differs from *Avdic* in two material ways. First, the jury did not submit a question on the accountability instruction, let alone any question whatsoever, before rendering their guilty verdict. The jury in *Avdic* asked for clarification on the accountability instruction and in the case used to distinguish *Powell*, the jury specifically asked for the definition of "willfully." *Id.* ¶¶ 13-14; see *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL App (1st) 093547, ¶ 98. Regardless, defendant suggests that there is general confusion concerning the meaning of "intent" as evidenced by the jury in the first trial requesting clarification. We find it unreasonable to assume that any purported confusion by the jury in the first trial as to the term "intent" carried over to the second jury which found defendant guilty without the need for clarification.

¶ 83    We also do not find that the facts of this matter render any common understanding of the term "intent" to be inherently confusing. The jury received a proper instruction for accountability. Together, this factual circumstance renders defendant's jury instruction challenge unsuccessful. See *People v. Chapman*, 194 Ill. 2d 186, 234 (2000) ("In light of the multiple-murder instruction given to the jury and the failure to show any confusion on the jury's part

31

regarding the term "intent," the trial court did not err in denying defendant's request for a jury instruction defining intent.").

¶ 84     More importantly "[a]ttempted murder is a specific intent crime" whereas murder is not. *People v. Smado*, 322 Ill. App. 3d 329, 338 (2001); see *People v. Howery*, 178 Ill. 2d 1, 42 (1997) ("In order to prove murder, it is not necessary to show that the defendant had a specific intent to kill or do great bodily harm or that he knows with certainty that his acts will achieve murderous results."). Accountability is tethered to the underlying crime and "must comport with the requirements of that crime" including an identical mental state. See *People v. Stanciel*, 153 Ill. 2d 218, 234 (1992). As such, when a defendant's guilt of murder, which is a general intent crime, "is established through accountability, [defendant] need only possess a general intent, with all the requirements that state of mind entails." *Id.*

¶ 85     The *Avdic* court found the circuit court erred in refusing to issue IPI Criminal No. 5.01A to clarify the *specific intent* required to prove defendant's attempt count and to distinguish it from the general intent count of murder. See *Avdic*, 2023 IL App (1st) 210848, ¶ 72. Dissimilarly, here, the court's refusal was based on the fear that the jury would impermissibly elevate the necessary intent to convict defendant on his single general intent count of first-degree murder.

¶ 86     IPI Criminal No. 5.01A appears in conflict with the lower intent requirement in general intent offenses. Compare IPI Criminal No. 5.01A (defining intent as one who acts "to *accomplish a result* or engage in conduct when the *conscious objective or purpose is to accomplish that result* or engage in that conduct." (Emphases added.)); with *People v. Garland*, 254 Ill. App. 3d 827, 832 (1993) (defining an offender's general intent where it "may reasonably be expected to follow from the offender's voluntary act even without any specific intent by the

32

offender.”). Issuing the IPI Criminal No. 5.01A is not a “logical step,” as defendant suggests, to inform the jury that defendant’s guilt depended on whether he acted with the conscious objective to bring about Allison’s death. It is an incorrect definition of intent for general intent offenses. To meet its burden, the State was not required to prove that defendant’s action of turning left at Howard’s instruction was done with the intent to accomplish Allison’s death. It was sufficient to prove that, by heeding Howard’s instructions, Allison’s death may have reasonably been expected. It follows that instructing IPI Criminal No. 5.01A in tandem with the accountability instruction would have posed the danger of jeopardizing the jury’s understanding of what mental state was required to convict defendant of the general intent first-degree murder charge.

¶ 87　　　　As stated in *Avdic*, a court has the discretion to refuse an instruction if it finds the instruction an inaccurate statement of the law. *Avdic*, 2023 IL App (1st) 210848, ¶ 72; *People v. Tisley*, 341 Ill. App. 3d 741, 745 (2003); Ill. S. Ct. R. 451(a) (eff. April 8, 2013). Therefore, we do not find error where the court determined the instruction would inaccurately state the law of the general intent required to find defendant guilty of his accountability charge, a general intent crime, based on the underlying first-degree murder charge.

¶ 88　　　　　　　　　　　　　　　F. Cumulative Error

¶ 89　　　　On appeal, defendant advances that the issues mentioned above in tandem with his month-long COVID-19 delay during his second trial arose to cumulative error and deprived him of a fair trial.

¶ 90　　　　“[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error.” *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). To warrant a new trial, the

33

cumulative errors must be extreme. *Hall*, 194 Ill. 2d at 350; *People v. Desantiago*, 365 Ill. App. 3d 855, 871 (2006). Before concluding cumulative error occurred, generally, a finding of reversible error on any individual issue is required. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 118.

¶ 91    Defendant asserts that his trial delay was prejudicial and further notes he was not present when the parties agreed to the month-long postponement after the second day of his trial. A recent Fourth District decision, *People v. Johnson*, 2023 IL App (4th) 210662, and Second District decision, *People v. Mayfield*, 2021 IL App (2d) 200603, both provide insight on appellate review of COVID-19-related delays and prejudice through the lens of a defendant's speedy trial rights. A summation of both opinions advises that while it is true postponement due to COVID-19 may have prejudiced defendant, and he was not present to consent to the delay, its result was a "two-edged sword" with the suspension of trial more than likely also having an adverse effect on the State's prosecution of the case. *Johnson*, 2023 IL App (4th) 210662, ¶ 66 (quoting *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986)). Although the introduction of defendant's shared news article on his Facebook account was in error, such error was harmless. *Supra* ¶ 75. Therefore, in light of the *Johnson* and *Mayfield* decisions, and in finding no reversible error on the individual issues that defendant presents on appeal, we reject defendant's claim of cumulative error.

¶ 92                                   G. Claim of Excessive Sentence

¶ 93    Last, defendant contends that during sentencing the court failed to consider mitigating factors, instead giving favor to defendant's behavior displayed in court. "[A]bsent an abuse of discretion by the trial court, the sentence may not be altered on review." *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). When a sentence imposed is within the statutory limits, it may only

34

be construed as excessive if the sentence varies greatly from the spirit and purpose of the law or is " 'manifestly disproportionate to the nature of the offense.' " *People v. Watkins*, 2023 IL App (5th) 200322, ¶ 44 (quoting *Stacey*, 193 Ill. 2d at 210).

¶ 94    It was not impermissible for the court to identify defendant's "rude, *** ugly, *** [and] obnoxious" behavior during sentencing. Indeed, the court's impressions garnered during proceedings are "proper factors to consider in imposing a sentence." *People v. Ward*, 113 Ill.2d 516, 528 (1986). The same can be said of the court's stated discontent from defendant raising his right wrist during the State's closing arguments and exclaiming "mistrial"—which the court said was a "little stunt with your some hidden-away wristband talking about a mistrial, blah, blah, blah." Although the court called defendant a "petulant childish soul," degraded his life by characterizing it as a "pitiful existence," and attacked his upbringing—all of which are inappropriate for judicial sentencing—these statements do not rise to an abuse of discretion.

¶ 95    Defendant unpersuasively requests the emerging adult theory, a theory subject to a district split and one that has not been adopted by our supreme court.[2] Defendant also takes issue that the principal of the offense, Howard, was not charged or incarcerated for Allison's death. We do not analyze the absence of a penalty against Howard. Rather, we review the legal propriety of defendant's sentence. His 66 years' imprisonment falls within the statutory range for a conviction of first-degree murder. Furthermore, we presume that the court considered any mitigating evidence absent some indication, other than the sentence itself, to the contrary. *People*

_____

[2]Younger was 22 years old at the time of his purported involvement in the underlying offense. Our supreme court declined the application of the emerging adult theory and dispelled any Eighth Amendment concerns for offenders between 18 and 21 years of age in *People v. Harris*, 2018 IL 121932, ¶ 59. There, the court held that for sentencing purposes, 18 years of age marks the present line between juveniles and adults. *Id.* ¶ 60. In a recent decision, the court reaffirmed that Eighth Amendment concerns between youth and sentencing are only applicable to juveniles. *People v. Moore*, 2023 IL 126461, ¶ 38.

*v. Elder*, 219 Ill. App. 3d 223, 230 (1991); *People v. Sawyer*, 139 Ill. App. 3d 383, 387 (1985), *aff'd*, 115 Ill. 2d 184 (1986). The court expressly stated that it reviewed the relevant caselaw and considered the aggravating and mitigating factors. Based on the foregoing, we find defendant's sentence was not an abuse of discretion.

¶ 96                                    III. CONCLUSION

¶ 97            The judgment of the circuit court of Peoria County is affirmed.

¶ 98            Affirmed.